## FORBES *et al. v.* SCANNELL.

Personal property beyond the limits of this State, assigned in trust to pay the creditors of the assignor, the assignor and assignee both residing, and being at the time, in the foreign jurisdiction where the property was, and possession being taken by the latter, vests in the assignee according to the *lex loci;* and his title will be maintained here against execution creditors of the assignor.

Such an assignment is not void as contravening the 39th Section of our Insolvent Act.

Rights of property acquired by contract, valid in the place where made, will be protected here.

Doubtful, whether the inference of title from the possession here of personal property, acquired by contract, in a foreign country, can be rebutted by the legal presumption, in the absence of proof on the point, that the contract was made subject to the provisions of a statute of the forum.

Under the treaty between the United States and China, of July 3d, 1844, and the act of Congress carrying it into effect, the United States Commissioner and Consuls constitute a judiciary for the government of the citizens of the United States in China, and are governed by the law of nations, the laws of the United States, the common law, and the "decrees and regulations" of the Commis-

Forbes *et al. v.* Scannell.

sioner, until modified or annulled by Congress. And such a judicial system is constitutional.

Assignments of personal property in China, made there between citizens of the United States resident there, will be tested by the common law.

People *v.* Gerke, (5 Cal. 281); Siemssen *v.* Boker, (6 Id. 250,) commented on.

An alien friend may sue an American in the Consular Courts in China, established under the treaty of 1844. And the assignees of personal property assigned there in trust for foreign creditors, among others, may be compelled by such Courts to execute the trust.

The right of Englishmen and Americans to sue each other in foreign countries where, by treaty, the laws of England and America, respectively, are the rule of decision, discussed and affirmed.

What is meant by the common law as used in the Act of Congress carrying out the treaty with China, stated.

The decision of the Consul, as to the validity of the assignment, is not conclusive in the Courts of this State.

An assignment of personal property in trust for creditors, need not be delivered, as a deed. The making of the trust and its acceptance, are sufficient, especially if accompanied or followed by the possession of the property.

In such assignments where no conditions are imposed on creditors, an acceptance by them is presumed.

Where an assignment embraces the property of the firm and of one member of the firm, in trust to pay his debts and the debts of the firm, it must be construed so as to give individual property to individual creditors, and firm property to firm creditors.

An assignment in trust for the benefit of each and all the creditors of a firm, is sufficiently specific. Such trust, under the law, imposes well defined duties, such as to convert the property into money and pay over the proceeds, etc.

After the assignee of property in trust for creditors takes possession, the title and trust become fixed and executed, and the assignment is not revocable.

An assignment in trust for creditors to two firms jointly, by the firm names simply, is good, and the acceptance of the trust by one of the Trustees is sufficient.

The want of a schedule of the property in such case, though sometimes regarded as a circumstance of fraud, will not of itself avoid the assignment.

One partner of a firm, expressly, or by implication, sole manager, his copartners being absent at a great distance, may assign the firm property in trust for the benefit of creditors, if the assignment be necessary for their protection.

That the Trustees employ the partner assigning, to aid them in winding up the concern, and pay him, and allow his wife some furniture, etc. is not proof of fraud in the assignment, there being no evidence that these benefits were promised at the time of the assignment.

APPEAL from the Fourth District.

The main facts are stated in the opinion of the Court, but it is deemed best to insert those findings of the Court below, not stated:

1. That on the 8th or 10th day of March, A. D. 1856, the commercial house of Nye Brothers & Co. then and before that time doing business in Canton, China, had returned to them by the European Mail which arrived at Canton on one of those days, protested bills to the amount of thirty thousand pounds, (£30,000,) drawn by the said house at Canton upon Frederick Huth & Company, Bankers, at London, G. B. and now the contesting creditors in this case.

2. That said assignment was executed by the said Gideon Nye,

before the American Consul, at the American Consulate, at Canton, on the day it bears date, and delivered to the assignees.

3. That the James Russell & Co. mentioned in said assignment, constituted, on the 11th of March, 1856, an American commercial house of long standing, good character, and at the date of the assignment, and long before, of unquestionable solvency. Said house being composed of Paul S. Forbes, Robert S. Sturges, Edward Cunningham, David N. Spooner, George Griswold Gray, Charles N. Spooner, and Frederick Reiche, and that James Purdon & Company, mentioned in said assignment, also constituted, on the 11th day of March, A. D. 1856, an American commercial house, established at Canton, of good standing, and at the time of, and long before, the assignment, of unquestionable solvency, composed of the said James Purdon and his brother, John C. Purdon, and that said parties, composing said firms, are the plaintiffs in this case.

4. That said assignees are competent and suitable persons to take charge of said assigned property.

5. That at the time of the said assignment, the house of Nye Brothers & Co. was composed of the said Gideon Nye, Jr. the sole managing partner, residing at Canton, China; of Clement D. Nye, residing at Shanghae, China; and of Charles Keating Tuckerman, a salaried partner, not participating in the profits or losses of the partnership.

6. That said Tuckerman also resided at Canton, but at the date of said assignment was on a voyage from Canton to Calcutta, *via* Manila and Singapore, having left Canton on said voyage in the month of January preceding.

7. That at the date of said assignment the said Clement D. Nye was at Shanghae, between which place and Canton it required ten or fifteen days to make the trip.

8. That the English steamer bringing the European mails with the protested bills, as aforesaid, at Canton, on the 8th or 10th of March, A. D. 1856, left Canton on the 12th with the return correspondence; and that the said Gideon Nye, Jr. between the time of the arrival and the departure of the said mail to and from Canton, had no opportunity of consulting with the said Clement D. Nye, or the said Tuckerman, respecting the propriety of said assignment.

9. That before the return of said protested bills the house of Nye Brothers & Co. had good credit in China and abroad, and that the return of said bills was the immediate emergency for making said assignment; and that said emergency did, in fact, exist at the time of making of the assignment.

10. That the assignees, at the date of the assignment, resided in China, except Paul S. Forbes, who resided in Boston ; and all the assignees were in Canton at the date of the assignment, except Edward Cunningham and Geo. G. Gray, who were at Shanghae, where they resided, and Charles N. Spooner, who was at Chow-Fow, where he resided, about midway between Canton and Shanghae.

11. That the assignees accepted the assignment, took possession of the property, real and personal, of Nye Brothers & Co. under the assignment, made sales of some of the said property, took the general management of the former business of Nye Brothers & Co. relating to consignments on hand and due, issued circulars to the creditors and correspondents of said house, made statements to said creditors concerning the liabilities and assets of said firm, employed the said Gideon Nye, Jr. and others, to assist in the administration of the assignment, and made the said Nye a reasonable allowance for his services.

12. That schedules of the debts and assets of the said Nye Brothers & Co. were made out by said Gideon Nye, in pursuance of the reservation in said assignment of the 11th of March, and delivered to the assignees a short time after the execution and delivery of said assignment of the 11th of March.

13. That prior to said assignment, the said Nye Brothers & Co. had an established credit upon the house of Frederick Huth & Company, to the amount of about thirty thousand pounds sterling, and that since the assignment the said Gideon Nye and some of the creditors of Nye Brothers & Co. contend that the terms of that credit were violated by Frederick Huth & Co. by their protest of said bills.

14. That the said assignment was executed in good faith by the said Gideon Nye in behalf of Nye Brothers & Co. for the benefit of all their creditors, and the same is free from any fraud in fact on the part of the said Nye Brothers & Co. or on the part of the said Gideon Nye, or on the part of the said assignees, in

the acceptance and administration of the same, and that the co-partners of said Gideon Nye did not and have not dissented or objected to said assignment.

15. That the teas in question constituted a part of the assets of the firm of Nye Brothers & Co. at the time of the assignment, and were actually delivered to said assignees subsequent thereto, who took possession of the same and shipped them to San Francisco for a market, consigned to Morgan, Hathaway & Co. for sale on their account in the regular course of their administration under the assignment, with instructions to remit the proceeds thereof to them, the said assignees.

16. The said teas being the product of China, where the assignment was executed and accepted, it was a proper act on the part of the assignees to ship them to San Francisco for a market —under the expectation of securing a higher cash price—and an immediate return of the proceeds to them—and that said transaction on the part of the assignees was and is entirely free from fraud.

17. That the suit upon which the execution was issued in this case by Frederick Huth & Co. against Nye Brothers & Co. was instituted on the 15th February, 1856, by attachment.

18. That there were several meetings of the Chinese creditors of Nye Brothers & Co. representing about two-thirds of the entire indebtedness of the house, soon after the assignment, before the American Consul in Canton, at which the assignees attended, and that said creditors assented to said assignment and co-operated with the assignees in carrying it out, etc.

19. That at said meeting the said creditors made a reasonable allowance of furniture to Mrs. Gideon Nye, for the use of the family, to which the assignees assented, and that in assenting thereto, the assignees were not guilty of fraud.

20. That the entire foreign population residing in Canton at the date of the assignment, including Missionaries, did not exceed three hundred, and that among this foreign population, there were not more than thirty or forty American residents.

21. That this population resided together at the place called the Foreign Factories, a place of limited extent, and devoted to the transaction of foreign business.

22. That there were no Americans residing in Canton at the

date of the assignment, except those connected with the commercial houses, and no suitable person residing at the Factories to act as assignee for Nye Brothers & Co. except those connected with a commercial house.

23. That it is customary for the foreign residents in Canton to execute legal documents and transact legal business at their respective consulates.

24. That the foreign residents of Canton, within the isolated place called the Factories, outside the wall of Canton, have no access to the Chinese Courts for the purpose of litigation, as established by the laws peculiar to that empire.

25. That the first mentioned assignment has been adjudicated upon in a controversy between the American citizens by the Consular Tribunal authorized by Act of Congress, and declared valid.

26. That there is no evidence tending to show that such an assignment is contrary to the positive law of China, or the policy of that empire, or contrary to any usage or custom of the foreign commercial population resident in China.

27. That the value of said teas is fifty thousand dollars.

From the foregoing facts, conclusions of law are by the Court:

1. That the assignment of the 11th of March, 1856, is valid, and vested in the assignees the title to the teas; was acquiesced in by the copartners of Gideon Nye, Jr. and is binding upon the firm.

2. That the assignees are entitled to the teas in question, as their property, to be disposed of by them, in the execution of their trust under the assignment.

3. That the defendant, the Sheriff of the county of San Francisco, having seized and taken said teas by virtue of an execution against the property of the said Nye Brothers & Co. is liable to said assignees in this action for the value thereof, and that judgment be entered accordingly.

4. And that the plaintiffs recover of the defendant, as Sheriff, the sum of fifty thousand dollars, the value of the teas at the date of the seizure.

*Julius K. Rose, Sidney L. Johnson, J. P. Hoge, and D. Lake,* for Appellant.

The only question is, whether these teas were, by the effect of the assignment, so vested in the plaintiffs as to deprive the judgment creditors of Nye Brothers & Co. of the right to seize them on execution.

The claim could not be maintained on such an instrument if executed in this State. The 39th Section of the Act for the relief of insolvent debtors and protection of creditors, (Wood's Dig. 501,) provides that, "No assignment of any insolvent debtor, otherwise than is provided in this Act, shall be legal or binding upon creditors." (*Adams* v. *Woods & Haskell*, in the matter of Lynch, Intervenor, 8 Cal. 152; *Cheever* v. *Hays*, 3 Id. 471; *Cohen et al.* v. *Barrett et al.* 5 Id. 210.)

The first question is whether this is a case for the application of the rule of international comity.

In the *Bank of Augusta* v. *Earl*, (13 Peters, 519—589,) the Supreme Court of the United States, by C. J. Taney, lays down the rule, but always with the restriction that the foreign law be not repugnant to the law or policy, or prejudicial to the interests of the country where its application is sought to be enforced. (See *Zipcey* v. *Thompson*, 1 Gray, 243; *Brown* v. *Knox*, 6 Mo. 306, 307; *Ingraham* v. *Geyer*, 13 Mass. 147; *Varnum* v. *Camp*, 1 Green, N. J. 326; *Brown* v. *Knox*, 6 Mo. 302.)

It may be contended that this repugnancy of the law of California to voluntary assignments for the benefit of creditors, is to be considered as confined to those made within the territory of the State. Of course, it can deny effect to foreign assignments only so far as they conflict with the rights of creditors to property within this State. The statute is general with respect to all creditors and all assignments, except such as our insolvent law permits, and the policy of the law, is as much offended by such assignments made elsewhere, as by those made here, when the former are set up in our Courts against the rights of creditors. For this question, it is not material that the property was transferred to the assignees before it came here. It is the title they assert to it, which our law proscribes, refuses to recognize, in opposition to the claims of creditors. If the rule of comity were to be admitted, the foreign assignee could as well claim property situated here, as to maintain his title to that brought by him into the State. The only question would be the priority

Forbes *et al. v.* Scannell.

of the assignment. (Story, Conflict of Laws, Sec. 398, quoting Lord Kenyon in *Hunter* v. *Potts*, 4 Term R. 182, 192; 2 Kent, 496; Story, Conflict of Laws, Sec. 415, and cases cited.)

But if the Court should be unable to come to this conclusion, the question then arises, What was the law of the place where the assignment was made? The burden of proof of it was on the Respondents, who set it up, and assert their claim under it. In the absence of proof of any other law applicable to the case, the Court must apply the law of the forum at the time the seizure was made. (*Leavenworth* v. *Brockway*, 2 Hill, N. Y. 202, 203, and the cases cited in the notes; *Harris* v. *Allnut*, 12 Lou. 465; *Allen* v. *Watson*, 2 Hill, S. C. 319, 322; *Ingraham* v. *Geyer*, 13 Mass. 147.)

The Respondents seem to acknowledge this, for they endeavor to establish the *lex loci*. They appeal to the treaty with China, of July 3d, 1844, negotiated by Mr. Cushing, Commissioner for the United States, (8 Statutes at Large, 592,) and to the Act of Congress passed on the 11th of August, 1848, for the purpose of carrying into effect the provisions of the treaty. (9 Statutes at Large, 275.)

From this Act it appears that, in all cases, civil and criminal, even in capital cases, the Consul determines both fact and law without the intervention of a jury, and in some cases without appeal. In cases of a certain magnitude he is to be assisted by two or three Assessors, of his own selection, but even then he decides the case, and their dissent only gives the right of appeal to the Commissioner, who decides, finally and alone, both fact and law.

It thus appears that this Act of Congress, for carrying into effect the treaty, requires a great deal of legislation on the part of the Commissioner before it can go into effect.

If we assume, for the moment, that Congress had the power, under the Constitution, to determine the legal relations, and legislate upon the rights of property and person of Americans in China, a power not admitted now, even in our own territories, and inquire what is the law of American citizens in China, under this Act, we shall be not a little puzzled to determine it. Recurring to the fourth section, which makes the common law

supply the deficiency of the statute law of the United States, the question arises, What common law?

In *Wheaton* v. *Peters*, (8 Pet. 591, 658,) the Supreme Court say: "It is clear there can be no common law of the United States. The Federal Government is composed of twenty-four sovereign and independent States, each of which may have its local usages, customs, and common law. There is no principle that pervades the Union, and has the authority of law, that is not embodied in the Constitution or laws of the Union. The common law could be made part of our federal system only by legislative adoption.

When, therefore, a common law right is asserted, we must look to the State in which the controversy originated." (See, also, Vol. 7, Opinions of Attorney-General, 504, Ex. Docs. 33d Cong. 1st Sess. No. 123, Vol. 16, 325.)

[Counsel here quote at length from Mr. Cushing's opinion as to what common law is meant by the Act of Congress, and as to the "decrees and regulations" which the Act authorizes the Commissioner in China to make to supply the defects in the common law, and the laws of the United States. For these decrees, etc. see briefs on file.]

Thus we see that in the judgment of the author of the treaty, the regulations of the Commissioner are necessary to determine what the common law is on all those questions in which the States and their Courts differ from one another.

The jurisdiction is limited by the 25th Article of the treaty, to controversies between American citizens.

No amendments to the Act of Congress, no regulations to define the rights of parties, or the relative jurisdiction of the Commissioner and Consuls, appear to have been made. A curious inquiry here presents itself, how far the Act of Congress is binding upon the creditors, not of other nations only, but even of our own.

It is direct legislation by Congress upon the rights of property and persons of American citizens by a power derived from China. It is a delegation, moreover, of legislative power to an executive officer, holding his place at the will of the President, and a union in his hands of powers executive, legislative, and judicial. It subjects American citizens, in their persons and

property, to laws which they have no voice in making; it holds them to answer for capital or infamous crimes, without the presentment or indictment of a grand jury, and to liability to be deprived of life, liberty, or property, without due process of law, and without trial by jury.    (Arts. 5—7, Amendments to Constitution of United States.)

The reasoning of the Supreme Court of the United States in the *Dred Scott Case*, (19 Howard, 449) disclaims this power in the General Government over American citizens, not merely in the States and Territories, but wherever they may be found.

This absolute power cannot be maintained under the clause which makes treaties the supreme law of the land, because no foreign power, by treaty, can give to our government more power over American citizens than the Constitution allows it to receive, hold, and exercise.    In the case of *New Orleans* v. *The United States*, (10 Pet. 736,) it is held that the federal powers cannot be enlarged by treaty.

The Act of Congress of August 11th, 1848, could have no effect upon the relations of debtor and creditor existing between Nye & Co. and other American citizens, much less upon their relations with strangers; it can afford no rule for determining their rights of property.

But this is the only attempt the Respondents have made to establish the *lex loci*.    This Court, then, must apply the law of the forum which sanctioned this seizure at the time it was made, and held null and void the title set up by the plaintiffs, because there is no other rule applicable to the case.

The decision of the Consul at Canton upon the validity of the assignment, can have no weight as evidence of the law of the place, because he was without jurisdiction even under the law itself, unaided by the "legislation" of the Commissioner, as Mr. Cushing says, and because the Act under which he made the decision, and the powers given to him by the Act, are unconstitutional and void, as to citizens, and without authority as to all others.

We say, then : 1st. That the well ascertained policy of this State denies all effect to such assignments, as against creditors, without regard to the place where the assignment was made, or to the citizenship of the creditors; and, 2d. That if it were a

case for the exercise of international comity, the law of the place of contract has not been proved by the plaintiffs, and no other rule than the law of this State is applicable to the case.

But the Respondents contend that if the foreign law is not proved, the Court should administer, not the statute law, but merely the common law of this State; and they rely upon the case of *Wright* v. *Delafield*, (23 Barb. 513) in which it is held that when the common law is known, proved, or assumed to prevail in another State, it will be administered by the New York Court, independently of New York statutes.

But this assumption of the existence of the common law in a State is equivalent to proof, *pro tanto*, of what its law is; and, in the absence of proof of a modification of it, by a statute of that State, the Court administers the common law as the ascertained law of the place of contract. The reasoning in *Wright* v. *Delafield* has no application to cases in which Courts refuse to take judicial cognizance of what the foreign law is.

In most of the cases in which the law of the forum has been applied to a foreign contract, it was statute law, and the principle is invariable and inevitable, that, in the absence of proof of what the foreign law is, the law of the forum, in its unity and entirety, is to be administered as the only rule left to the Court. The case of *Wright* v. *Delafield* did not turn upon that question, for it is admitted, (pp. 516, 517) that the application of the statute law of the forum did not change the result.

Indeed that case is but a confirmation of the rule we seek to apply. It supposes such a knowledge of the law of sister States as dispenses with the application of the rule of the forum. It is at variance with the rule that courts cannot take judicial cognizance of the laws of other sovereignties, so far only as certain sister States are concerned, but not as to other countries, governed by entirely different systems of law. (Story, Conf. of Laws, Sec. 637, and the cases cited in the notes; *Leavenworth* v. *Brockway*, 2 Hill, N. Y. 202, and the cases cited in the notes; *Brown* v. *Gray*, 16 Eng. C. L. 426; *Ingraham* v. *Geyer*, 13 Mass. 147; *Mason* v. *Wash*, Breese, Ill. 16; *Allen* v. *Watson*, 2 Hill, S. C. 319—322; *Bonneau* v. *Poydras*, 2 Robinson, La. 1—13; *Harris* v. *Allnutt*, 12 La. 465; *Crozier* v. *Hodge*, 3 La. 357.)

In the brief made by Mr. Duer, when this case was first before

this Court, there is an objection to this assignment, which we give in his language:

" Every assignment to Trustees, for the benefit of creditors, tends to hinder and delay even the creditors provided for, in the collection of their debts. They have been upheld, however, where otherwise unobjectionable, on the ground that, though the creditor was hindered in his legal remedy, yet another, through the medium of a Court of Equity, was afforded him. If this latter remedy be wanting, the creditor is hindered and delayed, and, indeed, utterly defeated in the collection of his debt. (5 Mass. 154; 6 Id. 342.) In this case any such relief as that of a bill in equity, to compel the Trustees to discharge their trust, or to remove them for misconduct, is wanting. The assignors have, among their creditors, citizens and residents of China, citizens and residents of the United States, citizens and residents of Great Britain, and also citizens of the United States and Great Britain, residing in China. To a bill filed by a creditor to compel the execution of a trust, all the creditors should be made parties, or it must be filed in his behalf, and that of all others. (4 Paige, 23; 23 Pick. 508; Burrill, 537.) Now what tribunal is there that could take jurisdiction of such an action? Where could Messrs. Huth & Co. go for relief? Not to the Courts in China, for American residents in China, being parties, the treaty divests the Chinese Courts of jurisdiction; not to the American Commissioner, or Consul, for the controversy would not be between American residents merely, though they would be necessarily parties; not to the public officers of the United States and China, acting in conjunction under the 24th Article of the treaty, for that applies to controversies between Chinese and American residents of China; and British subjects, in such action, would be the plaintiffs. In short, there is no tribunal competent to enforce the trust; and if the creditors of Nye Brothers & Co. cannot seize the property of their debtors, where they can find it, they are wholly without relief, legal or equitable; and the insolvent firm, and their assignees, may keep the assets forever."

We call the attention of the Court to the objections under the common law, apparent upon the face of the assignment: 1st. It is not a deed nor a declaration of Gideon Nye, Jr. much less of

the firm of Nye Brothers & Co. It is the language of the United States Consul, Perry, not of Nye, that is used in it. 2d. It is the act of Gideon Nye, Jr. and not of Nye Brothers & Co. 3d. There is nothing in it, or in the attestation of it, showing that it was delivered or was made to be delivered to the assignees. 4th. This memorandum, in the hands of the Consul, unaccompanied by schedules, operated no conveyance of realty or personalty. 5th. The failure to convey the realty, left all that part of the property of the assignor in his hands. It is not an application of the whole of the assignor's property to the payment of his debts. Moreover, one partner has no power to convey the realty of the other partners. 6th. It is made by one of three partners, without the knowledge, assent, or co-operation, of the other partners. (15 How. Pr. R. 268 ; *Haggerty et al.* v. *Granger*, Id. 243 ; *Patten et al.* v. *Wright et al.* Id. 481—488 ; 17 Vt, 393, Opinions of Wright and Redfield.) 7th. It places the individual creditors of Gideon Nye upon a par with the creditors of the firm of Nye Brothers & Co. and pays them *pari passu*, which is a fraud upon both the individual and partnership creditors. (29 Me, 59, 60 ; 25 Vt, 362.) 8th. The whole purport, aim, and effect, of the instrument, if supposed capable of effect according to its intent, is to transfer property to assignees, without giving them power to sell it or direction how to apply it for the benefit of the *cestuis que trust*, without power to take possession, to collect the choses in action, or any express direction or authority whatever. They are to hold on to it, apparently, until compelled to give it up, and creditors are to look for a Court of Equity in China, of general jurisdiction, capable of supplying the defects of the instrument. (*Grover* v. *Wakeman*, 11 Wend. 221 ; *Pierson* v. *Manning et al.* 2 Gibbs, Mich. 448 ; *Goodrich* v. *Downs*, 6 Hill, 438 ; 21 Pick. 185 ; 7 Maryland, 380 ; *Keep* v. *Sanderson*, 2 Smith, Wis. 58 ; *Hutchinson* v. *Lord*, Id. 313 ; 3 Selden, 438 ; *Murphy* v. *Bell*, 8 How. Pr. Rep. 468, Wells' Opinion ; 5 How. Pr. Rep. 444, 445 ; *Van Nut* v. *Yoe et al.* 1 Sandf. Ch. 7, 8—14 ; *Averill* v. *Foucks*, 6 Bar. S. C. R. 474, 475 ; *Arthur* v. *R. R. Bank of Vicksburg*, 9 Sme. & M. 433 ; Same point on same deed, *Bodley* v. *Goodrich*, 7 How. U. S. 277 ; *D. Ivernois* v. *Leavitt*, 23 Barb. 80, 81.) 9th. The assignor reserves to himself, individually, not to the firm, sufficient time to record in this Consulate a full and complete schedule of all

the assets and liabilities, whether appertaining and belonging to him personally or to the said commercial house of Nye Brothers & Co. 10th. The instrument has scarcely any of the essential features of an assignment enumerated by Mr. Burrill on page 238.

But this assignment can not be maintained, for the following additional reasons: Gideon Nye had no power to assign the partnership property without the concurrence of his copartners. Clement D. Nye was at Shanghai, within the same country, under the same jurisdiction, (by the act of Congress, that of the Commissioner,) at about five days distance from Canton. It does not appear that there was any danger of liens, or judgments, or any other excuse for not consulting the other partners, or at least Clement D. Nye. (*Haven* v, *Hussey*, 5 Paige, 21; *Hitchcock* v. *St. John*, 1 Hoffman, 518; *Deming* v. *Colt* and *Hayes* v. *Heyer*, 3 Sand. S. C. Rep. 290—293; *Fisher* v. *Murray*, 1 E. D. Smith's Rep. 341; *Kemp* v. *Carnley*, 3 Duer, 5; *Kirbg* v. *Ingersoll*, 1 Har. Ch. Rep. 172; Same case on appeal, 1 Doug. 477; See, also, the reference to it by Justice Daly in *Fisher* v. *Murray*, 1 E. D. Smith, 345. So in Missouri, in *Hughes* v. *Ellison*, 5 Mo. 465, 456; in South Carolina, in *Dickenson* v. *Legare*, 1 Dessaussure, 540, 541.) If a partner cannot assign the partnership effects to a Trustee for the benefit of partnership creditors, with or without preferences, still less can he assign them for the benefit of his individual creditors. (*Jackson* v. *Cornell*, 1 Sand. Ch. 348; *Kirby* v. *Schoonmaker*, 3 Barb. Ch. 51; *Moddevell* v. *Keever*, 8 Watts & S. 64, 65; *Murrell* v. *Neill*, 8 How. U. S. 421, 426, 427; *Robb* v. *Stevens et al.* 1 Clarke, Ch. 191—195; *Deveau* v. *Fowler*, 2 Paige, 400, 402.) The trust created in this assignment is "for the benefit of each and all the creditors of the said Gideon Nye, Jr. and the said commercial house of Nye Brothers & Co." It is difficult to understand this in such a manner as to authorize any discrimination between individual and partnership creditors. If it requires a distribution *pro rata* among the creditors of one class, it does so equally among those of the other, without distinction of classes or of funds.

There are numerous other objections to the assignment in this case. 1. There is the want of schedules. This has been held evidence of fraud. (*Pierpont* v. *Graham*, 4 Wash. 232—237. So

*Stevens* v. *Bell,* 6 Mass. 339—344; *Wilt* v. *Franklin,* 1 Binn. 523; *Burd* v. *Smith,* 4 Dall, 76; *Drakely* v. *Deforest,* 3 Conn. 272.) Possession did not accompany the transfer; and it is not shown that either assignment or schedules were ever delivered to the assignees. The fact that the debtor was employed as agent of the assignees, with a salary, does not constitute a constructive change of possession, when there was no actual change. (*Camp* v. *Camp,* 2 Hill, 628; *Hantford* v. *Artcher,* 4 Hill, 271, 297; Edwards on Receivers, 280 *et seq.* Edit. 1846; p. 408, Edit. 1857; and the opinion cited by him in *Hart* v. *Acker, Scholefield* v. *Hill,* and *Butler* v. *Stoddart;* Burrill, Chap. 25, p. 285.) The whole transaction was merely colorable, and to enable Nye to put the property where the creditors could not reach it by the ordinary process of the law. (*McAllister* v. *Marshall,* 6 Binney, 344, etc. *Cook* v. *Smith,* 3 Sandf. Ch. 336; *Connal* v. *Sedgwick et al.* 1 Barb. 212; *Caldwell* v. *Rowe et al.* 1 Smith, 195; *Same case,* 1 Carter, Ind. 405; *Findley* v. *Day,* 2 Sandf. S. C. 595; *Price* v. *Rickart,* 21 Barb. 475, etc; 1 Sandf. Ch. 252; Id. 7—14, before cited.) 2. The assignment is deficient in not declaring what is to be done by the assignees with the property assigned. The simple expression, "in trust, and for the benefit of each and all the creditors of the said Gideon Nye, Jr. and the said commercial house of Nye Brothers & Co." is all that indicates the objects and purposes and mode of execution of the trust. An authorization to sell on credit makes the assignment void. (*Barry* v. *Griffin,* 2 Com. 371.) A right to sell in such convenient time as shall seem meet to the assignees, has also been held void. (*Woodburn* v. *Mosher,* 9 Barb. 256.) The opinion cited from *Barry* v. *Griffin,* was held, in the case of *Nicholas* v. *Leavitt,* (4 Sandf. S. C. 252—293,) to be an *obiter dictum,* which could not be supported on authority or principle; but, in the Court of Appeals, it was sustained on both, (2 Seld. 510—521;) as also in the case of *Burdick* v. *Post et al.* (12 Barb. 168); 2 Seld. 522. In *Schufeldt* v. *Abernethy,* (2 Duer, 533—537,) it is held to be a consequence of the doctrine of the case of *Nicholson* v. *Leavitt,* (2 Seld. 521,) that "the assignment, to be valid, must either, by express words, or by its necessary legal construction, devote all the property which it embraces, not only absolutely and unconditionally, but immediately, to the payment of the creditors. In *Brigham* v *Tillinghast,* (3 Kernan,

215—220,) the Court of Appeals reversed the decision of the Supreme Court, in 15 Barb. 618, and held that authority to convert an estate into money, or available means, avoided the assignment as being equivalent to a power to sell on credit.    The Chancellor, in *Meacham* v. *Sternes,* (9 Paige, 398, 404, 405,) denies the right of an assignee to send the property away, to be sold on commission.    The meaning of the parties to the deed, may be inferred from their own practical interpretation of it.    It was so drawn as to leave to the assignees that discretion in the management and disposition of the trust property, which they have exercised.    In *Pierson* v. *Manning,* (2 Gibbs, Mich. 448,) it is held that if an assignment be so drawn as to hinder and delay creditors in its execution, it is a legal presumption that it was framed with that intent, and that a statute, making fraud a question of fact, has no application, when fraud is apparent on the face of the instrument; that it cannot then be rebutted by extrinsic evidence.    The application of partnership property to individual debts, and of private property to partnership debts, and the absence of all provision for taking immediate possession of the property, and making sale of it for cash, without delay, are of this character, even if the assignment had been in other respects properly executed by all the partners.    3. The assignment is not executed by creditors, nor is their assent to it proved, and for aught that appears, the trust, as to this property, was held for the assignors, and was revocable at their will.    Such is the common law, unmodified by State legislation.    (*Acton* v. *Woodgate,* 2 Mylne & Keen, 492; *Wallwyn* v. *Coutts,* 3 Merivale, 707; *Smith* v. *Keating,* 6 Mann. Grang. & S. 136; S. C. 60 Eng. C. L. 134—157; *McKinnon* v. *Stewart,* 1 Eng L. and Eq. 162, 163; *Garrard* v. *Ld. Lauderdale,* 2 Sim. 1; 3 Id. 14; Burrill, 85, 313, 314; *Widgery* v. *Haskell,* 5 Mass. 144—154; *Stevens* v. *Bell,* 6 Id. 339; *Ingraham* v. *Geyer,* 13 Id. 146; *Russel* v. *Woodward,* 10 Pick, 407; *Carr* v. *Dole,* 5 Shep. 358; Burrill, 215, Note 3, 216, 220, 221, Note 5.)    Under the provision of the instrument, giving partnership property to individual creditors, and individual property to partnership creditors, there can be no presumption of the assent of any of the creditors.    It is in fraud of the rights of one or the other class, and in the absence of schedules, neither class can know whether it is wronged or favored by the provision.    The

Forbes *et al. v.* Scannell.

reason of the rule for presuming the assent of the *cestuis que trust* fails. (*Drake* v. *Rogers,* 6 Mo. 317; *Swearingen* v. *Slicer,* 5 Id. 241; *Duval* v. *Raisin,* 7 Id. 440; Burrill, 308.) 4. No persons are named as Trustees. The assignment is made to two mercantile firms jointly—Russell & Co. and James Purdon & Co. Who composed these firms was not disclosed by the instrument; was not even known here when this suit was brought. Such a trust was not within the scope of the ordinary business of a mercantile firm, and the acceptance of it, by one or more of the partners, could not bind the firm and the partners who did not accept. (Story on Part. Secs. 111—113.)

Even if each member accepted, and became liable for the execution of the trust individually, and the firms turned out insolvent, would the creditors of the Trustee firms in their legitimate business have to share their assets with the *cestuis que trust* of the assignment? The firms may be found solvent, but are the firms bound? If not, who are the Trustees, and how can creditors know them and their fitness for the trust, even to this day? The assignment makes the firms Trustees jointly, not the individual members of them.

Under whatever system of law, then, the Court will test this assignment, it will be found void against the attachment of the Appellant. We think we have fully established, on every ground, that the law applicable to the cause is that of California in its entirety, as it stood when the Respondents appeared in her Courts, setting up title to the property in dispute; that the treaty and Act of Congress, which are set up as establishing a *lex loci contractus,* if admitted to have effect according to their intent, do not purport to establish a *lex loci,* a territorial law, but simply personal statutes, confined exclusively to American citizens; that the constitutionality, extent, force, and completeness of said personal statutes, as respects American citizens, admit of grave doubts; that, at least, it is evident, they offer no remedy for any foreign creditors under the assignment; and that if they be held to establish the common law of England as the law of this case, the assignment is invalid by that test, and void as to the Appellant.

*Halleck, Peachy, & Billings,* and *Gregory Yale,* for Respondents.

I. Does this assignment come under the general rule of international comity, and is its validity determinable by the *lex loci contractus;* or is it within the exceptions to that rule, and its validity to be decided by the *lex fori ?*

As a general rule, the law of the place where any instrument relating to personal property, is executed by a person domiciled in that place, governs as to the form, execution, effect, interpretation, and operation, of the instrument. *Lex loci domicilii regit actum.* (Story, Conflict of Laws, 242—244.) The repugnancy of the Statute of California, (39th Section of the Act of May 4th, 1852,) to voluntary assignments for the benefit of creditors, must be confined to those made within the State.

Counsel have misstated the reason of the distinction in the rule of comity with respect to foreign bankrupt laws and voluntary assignments. Effect is not given to the latter, "because most of the States have had laws authorizing and regulating them;" but because the *jus disponendi* applies to them, whereas the bankrupt law is a proceeding *in invitum.*

Nor is this assignment excepted from the general rule of international comity. 1st. It is true that contracts opposed to the national policy and institutions of a State, or to the good morals and duties of its subjects, are excepted from the general rule of comity. But these exceptions have each their limitations. Comity is the general rule, and the exceptions are strictly limited so as not to affect the principle which is recognized and established by the rule. (*Greenwood* v. *Curtis,* 6 Mass. 378.) They must in the first case be limited to contracts, the execution of which would be repugnant to the interests and rights of sovereignty of the interdicting State; and in the second case, those which are founded on moral turpitude, in respect either of the consideration or the stipulation. (Burge, Col. and Foreign Laws, Vol. 3, 779, 780, and authorities referred to.) 2d. It is true, that in certain cases, where the law of a State prohibits particular kinds of voluntary assignments for the benefit of creditors, it has been held that those made in foreign States, and which come within the prohibition, although valid by the law of the place where made, will not be sustained in the forum of the State so prohibiting them. But the exception in those cases is not made on the ground of repugnancy in the laws of the two places. The ex-

ception, with respect to personal property, when made, has been based on the fact that the foreign assignment was injurious to the rights and interests of the citizens of the prohibiting State, and it has been limited to property within its jurisdiction, at the time of the assignment, and held by the law as pledged for the payment of debts due within the State.

In the last case cited and relied upon by Appellant's counsel, *Varnum* v. *Camp*, (1 Green, N. J. 326—339,) it was the unanimous opinion of the Court that the merchandise which belonged to the assignor in New York, and was comprehended in the assignment, but had been sent to New Jersey after the assignment was made, was the property of the assignee, and could not be taken by the Sheriff under execution for a judgment creditor in New Jersey.

That decision is conclusive of the present case, even admitting that the assignment of Nye Brothers & Co. is by the laws of California declared fraudulent and void with respect to property situate in this State.

The rule above announced by the Supreme Court of New Jersey is nothing more nor less than the ordinary rule of bargain and sale of personal property.

If reduced to possession, actual or constructive, by the purchaser, it is not subject to attachment by the creditors of the vendor. (*Thuret* v. *Jenkins*, 7 Martin, 353.)

(See, also, *Richardson* v. *Leavitt*, Lou. Ann. 430 ; *Whitenwright* v. *Leavitt*, 4 Id. 352. The same doctrine was held in *U. S.* v. *Bank of U. S.* 8 Rob. 262 ; *Black* v. *Zacharie*, 3 How. 483 ; *Amor* v. *Cockburn*, 4 Mart. N. S. 667 ; *Babcock* v. *Malbie*, 7 Id. 137 ; *Russell* v. *Gale*, 4 Lou. 183 ; *Hepp* v. *Glover*, 15 Id. 461 ; *Powell* v. *Aiken*, 18 Id. 321 ; *Delvach* v. *Jones*, Id. 447 ; *Urie* v. *Stevens*, 2 Rob. 251 ; *Price* v. *Smith*, 5 Id. 124 ; *Bank of St. Mary's* v. *Morton*, 12 Id. 409 ; *Oliver* v. *Lake*, 3 Lou. Ann. 78.)

Nye Brothers & Co. had lost their control over this property. It was in the possession of the assignees, and held by them under a title valid by the law of the place. It was sent by them to California as their own property, under the law of the place from which it was sent. (See Bur. on As. 336 ; Story, Conflict of Laws, Sec. 411, 3d Ed.)

We consider the following propositions to be well established principles of public law :

1st. That, by the general rule of international comity, contracts valid by the law of the place where made are valid everywhere.

2d. That voluntary assignments of personal property for the benefit of creditors, are held to be within this rule of national comity.

3d. That the only exception to the application of this rule to such assignments is where the property assigned is within the jurisdiction of the prohibiting State at the time the assignment is made, or has not been reduced to possession, actual or constructive, of the assignees.

4th. That, with respect to property thus within the prohibiting State at the time of the assignment, or not reduced to the possession of the assignees, the attaching creditor must be a citizen of, or domiciled in, the prohibiting State where the property has its *situs.*

5th. Moreover, personal property, situated within the prohibiting State, is considered as pledged by the law only to the debts of the assignor which are there due and payable ; and the creditor, even though a citizen, cannot seek property for debts contracted and payable in foreign countries.

6th. Property upon the high seas at the time of the assignment is, under the common law, reduced to the possession of the assignees, *ipso facto,* by the assignment.

7th. To extend the law of the forum to property not within the State at the time of the assignment, would be giving to the law an extra-territorial effect, and to the Court an extra-territorial jurisdiction, which have never been claimed or permitted by Christian States.

It follows, therefore, that the goods, coming here in the possession, and *prima facie* the property of the assignees, could not be lawfully seized by the Sheriff in this case, and cannot be held by him under this execution without showing that the assignees have no title.

But conceding, for the purpose of argument, that it is necessary for us to show the validity of this assignment, we will now proceed to inquire :

II.   What was the law of the place where the assignment was made, and what tribunal was authorized to take jurisdiction and determine upon its validity under that law?

Under this head counsel cited 2 Phillimore on Int. Law, 235, 239, 271; Opinions of Attorney-Generals, Vol. 7, 346, 348, 498, 499, 501; Treaty with China, 1844, Art. 25; Act Congress Aug. 11, 1848, carrying into effect the Treaty; Decree of Robert M. McLane, U. S. Commissioner to China, distributing the judicial authority conferred upon the Commissioner and Consuls, to be found in " The China Mail " of May 15th, 1856.

This decree provides detailed " Rules and Regulations" for the law and equity jurisdiction of the United States' Consular Courts in China, the issuing of writs and processes, etc.   It says : " The United States Consular Court may exercise equity jurisdiction where the subject matter complained be a matter of—1st, Accident and mistake; 2d, Account; 3d, Fraud; 4th, Infants; 5th. Specific performance of agreements; 6th, Trusts.   *   * As to *trusts,* equity will superintend and protect the creation of trusts, whether vesting in the Trustee real or personal estate, and take jurisdiction of trusts, whether resulting from an express deed or the force of circumstances and the situation of parties, which latter are implied trusts." The decree provides, in detail, for new trials and appeals from the Consular Courts in all proceedings at law, and adds : " New trials and appeals, shall lie from the equity jurisdiction of the U. S. Consular Courts as from the common law jurisdiction of the same."

We deduce from the foregoing summary of laws and authorities :

1st. That, in the earlier part of the middle ages, merchants and traders, residing in foreign States, were not subject to the local jurisdiction, but only to the jurisdiction of Consuls and other officers appointed by their own States for that purpose.

2d. That, about the middle of the seventeenth century, this rule of general public law was changed throughout Christian Europe, the civil and criminal jurisdiction of foreign Consuls over their resident countrymen passing into the hands of the local authorities.

3d. That in Mohammedan, Pagan, and all unchristian domin-

ions, Consuls retain the jurisdiction which in earlier times they possessed everywhere.

4th. That the treaty between the United States and China recognizes and establishes, by express stipulations, this general principle of the exterritoriality of Americans in China.

5th. That the treaty provides that jurisdiction over Americans in China may be exercised not only by Consuls, but also by other officers, other public functionaries, public officers, and the authorities of the United States.

6th. That the Statute of 1848 (Secs. 1, 2, and 3) gives to the Commissioner and Consuls the judicial authority necessary to carry into effect the provisions of the treaty, without, however, distributing it between them, except in certain cases, but leaving that distribution to be made by regulation.

7th. That cases of insolvency are included among the questions thus left to be distributed by regulation, and that the Commissioner, in 1854, by a decree which is "binding and obligatory until annulled or modified by Congress," assigned to the United States Consular Court equity jurisdiction of all matters of *trust*, whether of real or personal estate, and whether resulting from express deed or otherwise.

8th. That in the exercise of the jurisdiction thus conferred, the Commissioner and Consuls, when acting in their judicial capacity, are to be governed by the law of nations, the laws of the United States, the common law, and the decrees and regulations issued by the Commissioner, until annulled or modified by Congress.

Objections made to this system of law and jurisdiction in China:

1. The first objection to be noticed is, that "It is direct legislation by Congress upon the rights of property and persons of American citizens by a power derived from China." A treaty cannot enlarge the constitutional powers of the Federal Government, or give to Congress the power to pass laws which shall contravene any of the provisions of the Constitution.

But the Constitution does not prevent " direct legislation by Congress upon the rights of property and persons of American citizens " in foreign countries. The reasoning of the Court in

the Dred Scott case is limited to the States of the Union, and to the Territory which has become a part of the United States. (19 Howard, 449, 450.)

How can the power "to make treaties" and "to regulate commerce," be exercised by the Federal Government, without in some degree affecting "persons and property" of citizens of States and Territories. (*The People* v. *Gerke,* 5 Cal. 381; *Cherac* v. *Cherac,* 2 Wheat. 259; *Orr* v. *Hodgson,* 4 Id. 453; *The Society, etc.* v. *New Haven,* 8 Id. 464; *Hughes* v. *Edwards,* 9 Id. 489; *Banks* v. *Corneal,* 10 Id. 181; *Henks* v. *Dupont,* 3 Peters, 242; *Ware* v. *Helton,* 3 Dallas, 230.)

The same rule of decision is applicable to the power of the Federal Government "to regulate commerce with foreign nations," etc. The power given to the Federal Government over any particular subject, cannot be controlled by the legislative enactment of a State, for that would annul and destroy the power itself.

Nor is there any difficulty in enforcing the trusts created by the assignment. The United States Consular Courts in China have the same jurisdiction with respect to Chinese and British subjects resident in China, and non-resident Americans and foreigners, that the Courts of California have with respect to the same persons resident in China, or elsewhere out of the United States. The European, Asiatic, and non-resident American creditors of Nye Brothers & Co. have the same relief, legal and equitable, in those Consular Courts, as they would have had in the Courts of California or of New York, if the assignment had been made in either of those States, and Messrs. Huth & Co. hold in this matter precisely the same relation to the United States Consular Court in Canton as they would hold in ordinary cases of litigation to the Courts of California. Although they are British subjects and non-residents in California, they may invoke the jurisdiction of our Courts over a resident defendant; and, although British subjects and non-residents in Canton, they may invoke the jurisdiction of the United States Courts in Canton, over American citizens resident there.

There is no plainer or better established principle of public law than this, that alien friends may sue in the Courts of the defendant's country.

The United States Attorney-General, Mr. Cushing, in his official opinion, has fully discussed this question with respect to the jurisdiction of the United States Courts in China. (Opinions of Attorney-Generals, Vol. 7, 517—519.)

[Counsel here quoted at length from Mr. Cushing's opinion; but, as the quotations appear in the opinion of this Court, they are omitted.]

These views are carried out in the "Rules and Regulations" contained in the decree of Commissioner McLane. It is especially provided, that the Consular Court shall exercise equity jurisdiction in all matters of trust, express or implied, and of real or personal estate.

III. Is this assignment valid by the laws of the place where it is made?

As preliminary to this discussion, let us, first, inquire how are those laws to be ascertained? And, second, by what are we to be guided in applying them to the present case?

1st. The system of laws by which the validity of this assignment must be tested is composed, as already stated: 1st. Of "the laws of the United States." 2d. Of "the common law;" and, 3d. Of the "Decrees and Regulations" made by the Commissioner.

Strictly speaking, there is no uniform system of common law of the United States; nevertheless, there is a diverse common law in the different States which is the English common law, or at least its great leading principles, modified and adapted to the legislative adjudication and usage of the people of the States. This, says Mr. Cushing, is the common law meant by the statute, and it "furnishes a code of laws for the great mass of civil or municipal duties, rights, and relations, of men, such as, within the United States, are the resort of the Courts of the several States." But, while the great body of this code is generally applicable, there has not been an entire uniformity in the modifications and changes of the English common law, made by the legislation and judicial construction of each of the States. To dispose of this difficulty, continues Mr. Cushing, the statute went one step further, and enacted that the Commissioner might, from time to time, issue decrees and regulations, "which shall have

Forbes *et al. v.* Scannell.

the force of law, and supply any defects and deficiencies in the common law and the laws of the United States." (Opinions of U. S. Attorney-General, Vol. 7, 504.) Referring again to the decree of Commissioner McLane, he says: "By 'common law' is intended that law which is to be found in the decisions of the Courts of Justice of the United States, both Federal and State Courts, as distinguished from that law which is found in the statute law of the United States and of the several States. These decisions are to be found in the numerous volumes of American Reports, known as reports of cases decided in the Courts of the United States, and of the several States of the American Union, and they embrace the common law of England, so far as the same has been judicially noticed as evidence of the common law, in the administration of justice in the United States. The Commentaries of Kent and Story on American law, and the American edition of Blackstone's Commentaries on the laws of England, are referred to as further evidence and explanation of the common law; and no practice or proceeding, and no final judgment, not expressly authorized by the laws of the United States, or the common law as thus defined, or by the decrees of the United States Commissioner to China, should ever have place in a United States Consular Court in China, whether the same be exercising a common law or equity jurisdiction."

The 34th Section of the Judiciary Act of 1789, says: "that the laws of the several States, except where the Constitution, treaties, or statutes of the United States, shall otherwise require or provide, shall be regarded as the rules of decision in trials at common law in Courts of the United States, in cases where they apply," and the 14th Section of the same act empowers the Courts of the United States "to issue all writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of the law." Chief Justice Marshall, in commenting upon these apparently repugnant provisions of that statute, regards the 14th Section as explanatory of what is meant by the 34th, and that by the principles and usages to which the power of the Court was intended to be limited by the act, he understands "those general principles and those general usages which are to be found, not in the legislative acts of any partic-

ular State, but that generally recognized and long established law, which forms the substratum of the laws of every State." (Burr's Trial, Vol. 2, 482.)

The laws, therefore, by which this assignment is to be tested, are not foreign laws, in the general sense of that term, but laws with which all Courts, whether of the United States or of a particular State, are presumed to be acquainted.

2d. In applying the law of New York or of any other State, we follow the interpretation and construction given to the law by the Courts of that State. So, in applying the above described system of laws in China to a particular case, we should be guided by the adjudications of the Courts whose duty it is to interpret and construe those laws. In this case we have the decision of the Consular Court of Canton, which under the law and decrees had jurisdiction of the matter, upon the validity of this identical assignment, the Court, after a careful consideration of the case, sustaining the assignment as good and valid. This is decisive of the case.

If that Court were to be considered foreign in the general sense of the term, its judgment would be of "universal obligation, as to all the matters of right and title, which it professes to decide in relation thereto." (Story, Conflict of Laws, 956, 989; Kaims on Eq. B. 3, Ch. 8, Sec. 4; *French v. Hall,* 9 N. H. 137.)

But this Court is foreign, only in relation to this State—it is a Court established by the United States, in a place over which the laws and jurisdiction of the United States are extended, so far as respects the persons and property in this case. It is not a constitutional Court, in which the judicial powers conferred by the Constitution on the General Government are deposited; but it is a legislative Court, created by Congress, in virtue of the general right of sovereignty which exists in the government, in a territory over which the exercise of this particular power and jurisdiction has been ceded to it by treaty. (*Am. Ins. Co.* v. *Canter,* 1 Peters, 511 *et seq.*) This is as much a domestic Court as was the Territorial Courts of Florida, referred to in the case just cited, or as are now the Territorial Courts of Oregon or Washington, and its judgments are entitled, in California, to the same respect and authority as the judgments of the Courts of those territories are here entitled to.

Objections made to the validity of this assignment :

1st. The first general objection is, that no law of the place has been shown allowing voluntary assignments for the benefit of creditors. Nor has any law of the place been shown, or alleged, which prohibits such assignments. The *jus disponendi*, or right to dispose of property by contracts *inter vivos*, has its origin in the law of nature, and is not the offspring of legislation. And where there is no statutory provision prohibiting or regulating the disposition of property by a particular kind of contract, such a disposition will be considered good and valid. " Foreigners enjoy every right which arises from the *jus gentium*. They may, therefore, perform all sorts of acts *inter vivos*. The right to make a testament, active or passive, is, on the contrary, derived from the civil law—*testamenti factio est juris civilis*—foreigners not enjoying what is of civil law, have not this faculty or right." (Pothier, Traité des Persones, Part 1, Tit. 2, Sec. 2.)

The French law, adopted the maxim of the Roman law, *factio testamenti est juris civilis*. For that reason a foreigner could not dispose of property by testament. He was forbidden by municipal law. But, says Pothier, the right to dispose of property by acts *inter vivos* is founded on the *jus gentium*, the law of nature.

" Where there is no insolvent law, there is nothing to prevent a debtor from making a voluntary assignment of his property in trust for his creditors. (Parsons' Mercantile Law, 307.)

2d. An assignment by the resident and managing partner, for himself and in the name of the firm, is sufficient to vest in the assignee the entire property of the firm, wheresoever situate. (See the authorities above referred to on the general doctrine of the *jus disponendi; Means* v. *Hapgood,* 19 Pick. 106, 107 ; *Deckard* v. *Chase,* 5 Watts, 23; *Hennessy* v. *The Western Bank,* 6 Watts & Serg. 310 ; *Harrison* v. *Sterry,* 5 Cranch.; *Henderson & Wilkins* v. *Tompkins,* Brock. 458 ; Parsons' Mer. Law, 175, Note 1.)

But Appellants contend that C. D. Nye, the only other full partner, must be considered as present in Canton at the time the assignment was made, although actually at Shanghae, nine hundred miles distant, with no means of communication except by a sea voyage of ten or fifteen days; and that he cannot be considered as assenting to the assignment, although it is particularly stated in the decree of the Consular Court that it

"has received the assent and adoption of his, the said Gideon Nye, Jr.'s copartners." Counsel have stipulated that Gideon Nye, Jr. was "the only resident partner, and managing the affairs of the house at Canton," and the evidence shows that C. D. Nye had not, for a long time, taken any part in the management of the affairs of the firm of Nye Brothers & Co. if, indeed, he had not actually ceased to be a partner.

But it is urged that there was no immediate necessity, on the 11th of March, 1856, of making an assignment at that time. We answer, the failure was caused by the return of thirty thousand pounds sterling of protested bills drawn by Nye Brothers & Co. on Huth & Co. which protested bills were returned to Canton on the 8th or 10th of March, 1856, and that two-thirds of the debts of the firm were due to Chinese creditors.

3d. Another objection is, that this assignment is insufficient to convey the real estate either of Nye or of the partnership, and, therefore, it left a part of the property of the assignor in his hands. If this were so, Huth & Co. have no reason to complain, for it left such unassigned realty liable for the payment of the debt due to them. It is shown, however, by Appellant himself, that a subsequent conveyance of the realty to the same assignees, for the same purposes, was made April 29th, 1856, ratifying this assignment, and curing any defects in the manner of its execution.

4th. The assignment says, "in trust, and for the benefit of each and all of the creditors." The use required to be made of the property assigned is sufficiently declared—it was for the payment of each and all of the creditors, without preference or distinction. The necessary legal construction of this is, that the property assigned was devoted "absolutely, unconditionally, and immediately," to this object.

5th. Another objection is, that the partnership funds are assigned "for the benefit of his (Nye's) individual creditors."

It is the evident intendment and fair construction of these words that the individual property of Nye is assigned for the benefit of his individual creditors, and the partnership property for the benefit of the partnership creditors.

6th. The next objection is, that "this assignment is not executed by creditors, nor is their assent to it proved." And it is

argued, that by the common law of England, "unmodified by State legislation," the assent of creditors is necessary to bind the property of the partnership involved in this action. We have shown that the *lexi loci contractus* is not the common law of England, "unmodified by legislation," but the common law, as modified by legislation, adjudication, and usage, in the several States, and as resorted to, interpreted, and applied, by the Courts of the United States, to the great mass of civil or municipal duties, rights, and relations, of men. It was this same common law which was applied by this Court in the case of *Billings* v. *Billings*, (2 Cal. 107,) before the statute was passed regulating assignments in this State. In that case the assignment was not executed by the creditors, nor did they assent to it; on the contrary, the suit was brought by an execution creditor, to set it aside as illegal and void, nevertheless its validity was sustained.

The argument that the assignment was revocable by the common law of England, even if that law, in its unmodified form, had been in force in China, can have no application to this case, because this property was reduced to the possession of the assignees, and sent by them to the consignees, Morgan, Hathaway & Co. In this case the assignment is absolute and unconditional, the assignor neither retaining power to change the trusts nor a control over the deed of trust. (*Fellows* v. *Com. Bank,* 6 Rob. 242.)

By the common law, the assent of creditors will be presumed where no release or other condition is stipulated for, and the property assigned is for the benefit of all the creditors *pro rata;* nor is it very objectionable to a deed of trust, under the common law, that the *cestui que trust* is not a party to a deed. (*U. S.* v. *U. S. Bank,* 8 Rob. Lou. 262; *Oliver* v. *Lake,* 3 Lou. Ann. 78; *Layson* v. *Rowan,* 7 Rob. Lou. 1; *Halsey* v. *Whitney,* 4 Mas. C. C. 206; *Brooks* v. *Marbury,* 11 Wheat. 78; *Brashear* v. *West,* 7 Pet. 608, 613; *Nicoll* v. *Mumford,* 4 Johns. Ch. 522; Bur. 308 and Notes.)

7th. Another objection is that no persons are named Trustees, but only mercantile firms, which, not being formed for such objects, cannot legally be made Trustees, as firms, but only as individuals, and therefore they are required to be individually named in the assignment. But counsel have given no authori-

ties in support of this objection, and the position is opposed to the established doctrine of trusts. Trusts, when once created, never fail on account of the non-appointment, disability, incompetency, or death, of the Trustee. In either of these contingencies, a Court of Equity will follow the subject matter of the trust, and provide the proper means for executing it. (Hill on Trustees, 48.)

But it is urged that as the firms, and not the individual members, are named, and as such trusts are not within the ordinary business of a mercantile partnership, neither the firms nor the individual partners are responsible for any neglect or misapplication of the trust funds, and that, therefore, the assignment must be regarded as made to hinder, delay, and defraud, the creditors. This proposition is incorrect, both in its premises and in its conclusion. Partnerships and individual partners are responsible for the acts of a single copartner in the name of the firm, even outside of the ordinary business of the association, where the other partners concur, either expressly or impliedly, in such acts. (Collyer on Partnership, Sec. 390.)

In this case all the partners, (with a single exception,) of both firms were present, and accepted the trust, and immediately issued circulars in the names of the firms to that effect.

In assignments for the benefit of creditors, the assent of the Trustees is always presumed, until the contrary is shown, and the legal title passes without their assent, if made with their knowledge and privity. If such an assignment be made to two or more persons, and one of them accepts the trust, and the others repudiate it, the assignment is nevertheless operative as to the assenting Trustee, unless it contains some condition rendering the assent of all requisite. (2 Kent, Com. 533, notes; *Galt* v. *Dihrell,* 10 Yerger, 146; *Gordon* v. *Coolidge,* 1 Sumner, 537; *Neilson* v. *Blight,* 1 Johns. Cases, 205; *Moses* v. *Murgatroyd,* Johns. Ch. 129.)

8th. Another objection is "the want of schedules." The authorities referred to contradict the position taken. It is distinctly held, in the cases cited, "that the mere circumstance of a want of schedule, will not render it (an assignment) fraudulent." It may be an *indicium* of fraud, or an "item in the list of circumstances to establish a fraudulent intent," but nothing

more, if the transaction be fair and possession accompanies the transfer.

9th. The next objection is, that Nye was "employed as agent of the assignees, with a salary." The authorities cited go no further than to make this a badge of fraud, and the finding of the Court is, that there was no actual fraud. (*Billings* v. *Billings*, 2 Cal. 107.) But the assignee may employ the assignor as clerk, agent, etc. (Burrill, 430, 431, 174.)

To the third finding it is objected that there is no evidence that the assignment was delivered. The original instrument was made before the Consul as a judicial act, and became a part of the records of his office, as is the usual practice in Consulates.

This mode of execution and delivery to the officer is, the world over, a delivery to the parties. Moreover, the transcript of that act, under the signature and seal of the Consul, which has the force and effect of an original, is found in the hands of the assignees, and filed by them in this case. The delivery of the property and its possession by the assignees, is conceded by the stipulation.

With respect to the form of this instrument, and the manner of its execution, which have been so much commented on by counsel, it has been decided to be valid by the proper forum of the place where it was made. The Consul followed the common forms laid down in the most approved consular form-books. (See the official work of M. Declerq on Diplomatic and Consular Forms.)

Summary:

1st. These goods, being in the possession of Respondents, and held by them under title *prima facie* valid, the burden of proof rested on Appellant to show a better title in execution debtors, and this he has sought to do by attempting to establish the invalidity of the assignment by which this property was transferred from the execution debtors to the Respondents.

2d. The title of Respondents was acquired in a foreign country, and has been adjudged good by a Court of competent jurisdiction of the country where the parties were domiciled, where the contract was made, and where the property was situated. It must, therefore, be held good everywhere.

3d. But conceding that the Courts of California may disregard such judgment of the forum *loci rei sitae*, and may re-examine the validity of this assignment, its validity must be determined by the *lex loci contractus*, unless the case comes within the admitted exceptions of the rule of international comity.

4th. It has been shown that this case is not within any of the exceptions to the rule of comity which have been admitted by any Court, even by those Courts which have carried the doctrine of the *lex fori* the very furthest.

5th. The *lex loci contractus* is not, properly speaking, a foreign law, nor the statute of any particular State, nor the English common law; "but that generally recognized and long-established law, which forms the *substratum* of the laws of every State."

6th. The *jus disponendi* of the assignors, not having been limited by any statute, their general right, under the system of laws prevailing in China, to transfer this property to Respondents, in trust for their creditors, cannot be denied. It is sustained not only by the judicial decisions of England and America, but also by the decision of this Court, in the case of *Billings* v. *Billings*, (2 Cal. 107).

7th. The assignment in this case being sufficient, when accompanied with a change of possession, to vest the title of property in Respondents, their title to these teas can only be impeached on the ground of actual fraud.

8th. But Appellant, after the benefit of a new trial for the express purpose of giving him an opportunity to impeach the *bona fide* character of this assignment, has not only failed to establish any fact showing a fraudulent intent, but Respondents are now fortified by the finding of the Court, sitting as a jury, against the allegations of fraud.

Baldwin, J. delivered the opinion of the Court—Field, J. concurring.

Suit brought to recover damages of defendant for taking certain teas. The case is one of more than usual interest and importance. It involves principles novel in their application in this State, and it has been ably and fully argued at the bar and upon briefs. The general nature of the suit may be thus stated: Nye

Brothers & Co. were a mercantile firm, composed of citizens of the United States, residents of, and doing business in, Canton, China, before and on the 11th March, 1856. On that day they failed, when Gideon Nye, Jr. one of the firm, the only resident partner, and managing the affairs of the house at Canton, appeared before Oliver H. Perry, United States Consul at Canton, and signed and acknowledged before the Consul this instrument in writing:

"Be it known, that on the eleventh day of March, A. D. eighteen hundred and fifty-six, before me, Oliver H. Perry, Consul of the United States of America, at Canton, China, personally came and appeared Gideon Nye, Jr. a citizen of the United States of America, and at present a resident of the city of Canton, China, and a partner in the commercial house of Messrs. Nye Brothers & Company, residing, transacting, and doing business in the city of Canton, China, and being the only partner in said commercial house of Nye Brothers & Company here present, and requested me to note, that he desires to assign, and does assign, all and singular the real and personal property belonging and appertaining unto the said commercial house of Nye Brothers & Company, whether situate in China or elsewhere, jointly unto Messrs. Russell & Company, a commercial house residing and doing business in Canton, China, and unto James Purdon & Company, also a commercial house, residing and doing business in the said city of Canton, China, in trust and for the benefit of each and all the creditors of the said Gideon Nye, Jr. and the said commercial house of Nye Brothers & Company, and the said appearer declared that he reserves to himself sufficient time to record in this Consulate a full and complete schedule of all the assets and liabilities, whether appertaining and belonging to him personally, or appertaining and belonging to the said commercial house of Gideon Nye, Brothers & Company, of which he is a partner, as aforesaid.

GIDEON NYE, JR. for self and<br>NYE BROTHERS & Co.

Noted before me on the eleventh day of March, A. D. eighteen hundred and fifty-six, at the hour of two, P. M. this day, in faith whereof I hereunto sign my name and fix my seal of office.

OLIVER H. PERRY, U. S. Consul.     [L. S.]"

That at the time of executing this instrument, Nye Brothers & Co. were largely indebted to the citizens and residents of China, and to citizens and residents of the United States, and those of Great Britain, and also to citizens of the United States and Great Britain residing at Canton. The merchandise in controversy was shipped by Nye Brothers & Co. from Canton, to Morgan, Hathaway & Co. at San Francisco, in the ship called the "Berreda Brothers," before their failure in March, 1856, and that the "Barreda Brothers," returned to Canton after the failure, from stress of weather, when the plaintiffs took actual possession of the goods as assignees under the before mentioned assignment of Nye Brothers & Co. and shipped them directly to Morgan, Hathaway & Co. for sale, with instructions to account to them as such assignees for such proceeds, and the seizure of these teas was made by the defendant while in the possession of Morgan, Hathaway & Co. under the consignment of the assignees. After the execution of the assignment, a controversy arose between one A B, a citizen of the United States residing at Canton, and these assignees, before O. H. Perry, U. S. Consul at Canton, in which was involved the question whether or not the assignment was valid; and the Consul held, for reasons given in his judgment or opinion, which is to be found in the record, that it was, and that an assignment, made after insolvency, which divides the assets with perfect equality among all the creditors, is considered by the Court, under its equity jurisdiction, as a valid trust, and will be sustained. That the assignees have, by general and special circulars, notified the creditors and others dealing with the house of Nye Brothers & Co. of the state of the assets and liabilities, and their business as assignees in the execution of their trust is still unsettled. The defendant seized the goods by a valid execution, issued on a valid judgment, in favor of *F. Huth & Co.* v. *Nye Brothers & Co.* defendant knowing of plaintiffs' claim.

Some other facts appear in the record. These relate mainly to the question of fraud in fact, in the assignment, and will be noticed when we come to consider that subject. The case was tried by the Judge below, who made a finding of facts and legal conclusions, and gave judgment for plaintiff for the amount claimed. The defendant appeals from the judgment.

The first point made by the Appellants is that this assignment is void. The argument in favor of this general proposition is, that by the 39th Section of our statute for the relief of insolvent debtors and protection of creditors, (Wood's Digest, 501,) an assignment of this character is absolutely void; that upon this subject, our own legislation has declared a State policy, and that while effect will be given in the Courts of a State to contracts entered into beyond its jurisdiction, this general rule is not based upon any absolute right in a party to such enforcement of the contracts, but is a mere regulation of international comity, and this comity will not be exercised when it is opposed to the interests or declared policy of the State of the forum. And the conclusion of the learned counsel is, that this case falls within the exception just given. There would be more force in this view, if this were an executory agreement to make an assignment in this State, of this character, or if this property were within this State at the time of the assignment. But here the contract, such as it was, was executed beyond the jurisdiction. The property was beyond this State—the parties, also; the actual possession taken, and the title vested in the foreign jurisdiction. The property came into this State with the full effect—whatever that was—which the contract made abroad impressed upon it. It is not even shown that at the time of that contract the property was agreed, or intended to be shipped, as assigned property, to this State; on the contrary, at the time of this assignment, the teas were at sea; they were taken possession of on the return of the vessel, by the assignees, and again transmitted. It cannot be pretended that this policy of our statute is anything more than a conventional rule, established for the regulation of a certain class of contracts and interests. The rule itself is not of natural obligation. It is considered here as the safer and better rule; it is considered elsewhere, and by the common law, as not as conducive to the public welfare as a contrary rule. It does not occupy a more favorable position in this respect than our Statute of Frauds, requiring certain contracts to be in writing in order to prevent perjury, and yet we presume no one would contend, that because, under our system, we refused to give effect to any other contract than one so evidenced, we would refuse to enforce a

Forbes *et al. v.* Scannell.

contract, valid in the place where made, because not executed according to our statutory modes; and especially would it not be contended, if a right of property had vested under such law, in the foreign country, that we would not recognize the title here. The truth is, we do not consider this question as one of comity at all. It is a pure question of property. By our general laws, we recognize the duty of government to protect property, and that is property which is acquired by contract, lawful and effectual, to pass title in the place where it is made. It might as well be said that if a man made his money by usury, in California, and carried it into Pennsylvania, the Courts of that State would refuse to recognize his right, because usury is against the policy of Pennsylvania. Or if won at cards in Mexico, where no laws exist against gaming, it would cease to be his property whenever brought into this State.

If this property had been sold by these assignees in China to third persons, it is not a question that the title would be upheld here if the property vested abroad and had been brought here by the purchaser. Why? Because the attributes of property —a thing acquired by a legal mode of acquisition—had been impressed on it—where, is wholly immaterial, or, probably, by what law, unless, indeed, the Courts had to give effect to some worse principle than a rule of the common law of England, or violate some better declared public policy than a section of the statute regulating modes of assignment of property here. The authorities cited have no application to the facts here. The early cases in Massachusetts maintain only the doctrine that where the property is within the State, the Courts will not allow a contract operating on it to be made in another State, the effect of which is to dispose of the property differently from the mode provided in Massachusetts. In other words, Massachusetts will not suffer her own resident creditors to be prejudiced in favor of foreign creditors, by giving the debtor the right to assign the property in the State contrary to the mode she has prescribed for assignments. But Massachusetts has never held that when the property is in New York, and there assigned, and the assignee legally vested with the title, she will not recognize the title when the property is brought within her jurisdiction.

It is hard to see by what rule of justice or of policy, Huth, a

citizen of London, could claim from the laws of California any greater privileges than he could obtain from his own Courts if this proceeding were pending in England.

The Appellants contend that, in the absence of any proof of the law of the place of contract, our own law must be presumed to prevail, and they cite several authorities which seem to maintain this doctrine. This presumption, if it be one, would present a curious illustration of a fact presumed to exist, when in every single instance, probably, in which the application is made of the presumption, it would falsely represent the real fact. That China had ever passed or given effect to the 39th Section of our insolvent law is rather a violent intendment, but possibly the principle invoked was necessary, as some rule must be had for the determination of matters of litigation, and the convenience or necessity of the case constrains the adoption of the one nearest at hand when the foreign rule is unknown. (See 2 Hill, 202; 12 La. 465; 13 Mass. 147.) Having shown possession and control of this property in China, or on the seas, and the property having been brought into this State by the plaintiffs, by a law of universal application a title *prima facie* good is shown by the plaintiffs. Upon that title so proved, without showing anything more than this possession, the plaintiff would be entitled to recover for a seizure of it in this State, unless the defendant showed a better title in himself or in some person whose right he legally represented. To prove this title he is forced to assail the validity of this assignment. The burden of proof is on him to show the invalidity of it, and, as the invalidity rests upon its illegality, and this depends upon the proper construction of the law of the place of contract, he assumes the responsibility of showing what that law is and how this transaction opposes it. But the Appellant answers this position by the not very satisfactory appeal to the principle of presumption already adverted to, to wit: That the law of the forum is to be taken to be the law of the place of contract, and calls upon the Respondent to show that it is different. We are not satisfied that the rule invoked is properly applicable to such a state of facts as this; that to rebut an inference of title from possession acquired in a foreign country, a party can refer to a local statute of the forum, and demand, as a presumption of law, that the contract under

which his adversary claims was made subject to its provisions. But, as the facts are all before us, probably the principle is not important enough to the decision to require us to consider it at length, or to pass upon it; for, when all the facts are before the Court, and they are undisputed, it is not very material upon which party rests the *onus* of proof. The solution of this difficulty is attempted by the Respondent, who asserts, in answer to this argument, that the real *lex loci, quoad* this transaction, is the common law of England, that law, in effect, having been established by the treaty between the United States and China, of July 3d, 1844, negotiated by Mr. Commissioner Cushing, and by the Act of Congress passed on the 11th of August, 1848, for the purpose of carrying into effect the provisions of the treaty. This leads us to an examination of the extent and validity of this regulation, since it is claimed to exercise an important, if not controlling, influence over this litigation. It is provided in this treaty that questions between citizens of the United States in China shall be subject to the jurisdiction and be regulated by the authorities of their own government. And this principle seems to be the same which obtains as to British subjects domiciled in that empire. It seems that American citizens residing for the purpose of trade in the ports of China are not regarded as subjects of that government, but that for purposes of government and protection, they constitute a kind of colony, subject to the laws and authority of the United States. An interesting letter from Mr. Cushing to Mr. Calhoun, then Secretary of State, dated September 29, 1844, was written in illustration of this treaty. He says: "The Consuls of Christian States, in the countries not Christian, still retain, unimpaired, and habitually exercise, their primitive function of municipal magistrates for their countrymen; their commercial or territorial capacity in those countries being but a part of their general capacity as the delegated administrative and judicial agents of their nation. * * * In China I found that Great Britain had stipulated for the absolute exemption of her subjects from the jurisdiction of the Empire, while the Portuguese attained the same object through their own local jurisdiction at Macao. I deemed it, therefore, my duty, for all the reasons assigned, to assert a similar exemption on behalf of the citizens of the United States.

This exemption is agreed to in terms by the letter of the treaty of Wang Hija; and it was fully admitted by the Chinese in the correspondence which occurred contemporaneously with the negotiation of the treaty. By that treaty, thus construed, the laws of the United States follow its citizens, and its banner protects them even within the domain of the Chinese Empire.

\* \* \* In extending this principle to our intercourse with China, seeing that I. have obtained the concession of absolute and unqualified exterritoriality, I considered it well to use in the treaty laws of such generality in describing the substitute jurisdiction, as while they held unimpaired the customary, or law of nations, jurisdiction, do also leave to Congress the full and complete right to define, if it please to do so, what offices, with what powers, and in what form of law, shall be the instruments for the protection and regulation of the citizens of the United States."

Mr. Cushing, (Opinion of Attorney-General, Vol. 7, 501,) shows that the treaty, besides conferring on American citizens in China exterritoriality in commercial matters, provides, in respect to civil matters : 1. That questions arising between citizens of the United States, in China, shall be subject to the jurisdiction and regulated by the authorities of their own government. 2. That in controversies between a citizen of the United States and China, the authorities of the two governments are to have concerted action. 3. That in controversies between the United States citizen and other persons, not Chinese, the adjustment is to be regulated by the international relations of the United States and the Government or State of that other person.

To give effect to this treaty, the Act of August 11, 1848, was passed by Congress. The " authorities " of the United States, were by this Act directed in respect to their duties and the manner of performance, and the new jurisdiction regulated and defined. The system of administration was constituted by: 1. The laws of the United States, so far as suitable to carry the treaty into effect. 2. The common law, in all cases where the laws of the United States are not adapted to the subject, or are deficient in the provisions necessary to furnish suitable remedies. 3. Decrees and regulations, by the Commissioner, which shall have the force of law, and supply such defects and deficiencies as still

remain to be supplied, and the regulations, orders, and decrees, made by the Commissioner, with the advice of the several Consuls, must be transmitted to the President, "to be laid before Congress for its revision, but to be binding until annulled or modified by Congress." The first three sections of this statute give to the Commissioners and Consuls the judicial authority necessary to execute the provisions of the treaty, without, however, distributing it among them; but according to Mr. Cushing, this duty of distribution was left to the regulation of the Commissioner and Consuls, under the general power in the statute to which we have referred. These undistributed powers embrace the general doctrine and scope of what, in our system, constitutes equity jurisprudence, and some matters of more special jurisdiction—as insolvency—*habeas corpus,* etc. On the second of October, 1854, Robert M. McLane, being the United States Commissioner to China, with the advice of the United States Consul, issued a decree distributing the judicial power, by which jurisdiction was vested in the Consular Court over equity matters, trusts, etc. After enumerating the heads of jurisdiction, this regulation proceeds: "As to trusts, equity will superintend and protect the creation of trusts, whether vesting in the Trustee real or personal estate, and take jurisdiction of trusts, whether resulting from an express deed or the force of circumstances and the situation of the parties, which latter are implied trusts." It will thus be seen that the Commissioner and Consuls constitute a judiciary for the government of the citizens of the United States in China, and as such, and when so acting, are governed by the law of nations, the laws of the United States, the common law, and the decrees and regulations of the Commissioner, until the latter are modified or annulled by Congress. There having been no express modification or change of the common law, in respect to any rule applying to this matter, by the laws of Congress or otherwise, the rules of the general system known as the common law would seem to prevail over this subject.

It is suggested, though no great stress seems to be laid upon the objection, that Congress had no constitutional power to provide a system so organized and for such objects. But we are not disposed so to hold. It would require an extremely clear case of repugnancy to the Constitution of the United States to

justify us in holding unconstitutional such a power of protection to American citizens—a power alike essential to the maintenance of friendly relations with a State like China and to secure the rights of our people there, and one, moreover, so long recognized as well by our own government in other instances, as by other christian powers in their intercourse with such nations.

The general authority given to Congress to regulate commerce with foreign nations could, probably, find no more useful or appropriate means of exercise than in treaties and laws withdrawing our citizens domiciled in unchristian nations from the jurisdiction of such governments, and confiding their rights of property and person to judicial officers of their own country, administering, under responsibilities to a common government, laws, with the general spirit and principles of which those citizens are familiar. That government would be weak, indeed, which could not, in this peaceful and unobjectionable mode, with the assent of the foreign power, exercise this wholesome protection and restraint over its own citizens abroad. The case of *Dred Scott,* (19 How. 449,) maintains no such doctrine as that it is cited to sustain; but the general principles there declared seem carefully to exclude the construction given, and to limit their operation to the territories " within the dominion of the United States." In *The People* v. *Gerke,* (5 Cal. 381,) this Court, in giving effect to the treaty with the kingdom of Prussia, which had direct effect on property in this State in opposition to its laws of descent, went further than it is necessary to go to uphold the treaty and laws in question. Mr. Justice Bryan said in this case: " So far as the authority of the Federal Courts is concerned, they appear to have uniformly administered the law upon the meaning given by construction to the language of the treaty, seeming never to have, in any respect, doubted the power of the General Government to provide by treaty with a foreign power for the mutual protection of the property belonging to the citizens or subjects of each in the territory of the other. The treaty-making power of the Federal Government must, from necessity, be sufficiently ample so as to cover all of the usual subjects of treaties between different powers. If we were to deny to the treaty-making power of our government the exercise of jurisdiction over the property of deceased aliens, upon

the ground of interference with the course of descents or the laws of distribution of a State where property may exist, by parity of reasoning we should not make commercial treaties with foreign nations, because, it might be said, some of their provisions would injure the business of a portion of the citizens of one of the States of the Union.

If the treaty-making power which resides in the Federal Government is not sufficient to permit it to arrange with a foreign nation the distribution of an alien's property, then that power resides nowhere, since it is denied to the States, and we must confess our system of government so weak and faulty as to be incapable of extending to its citizens in foreign lands that protection which is most common among a majority of modern civilized nations."

In *Siemssen* v. *Bofer*, (6 Cal. 250,) the doctrine of *People* v. *Gerke* was doubted by the late Chief Justice; but the decision has not been expressly overruled. Numerous cases sustain the general principle and reasoning upon which Gerke's case rests. (See 4 Wheaton, 453, and the other cases cited in Respondent's brief.)

In the second place, it is urged with much earnestness that this assignment is void, because no means of enforcing the trusts against the assignees exist in the local jurisdiction. It is said that the only ground upon which assignments for the benefit of creditors are supported is, that Courts of Equity can compel the fair and faithful execution of the trusts they create. But as Huth & Co. English creditors, could not go before the American authorities, they would be without any relief. As this is a matter of local law, pertaining to the *lex loci contractus*, the Appellant should show, as against an assignment seemingly otherwise authorized, the existence of this cause assigned for its invalidity. It is not to be presumed *a priori*, that any system of jurisprudence could be so defective as to withhold some remedy for so flagrant a breach of duty, as the refusal to comply with the obligations of such a trust. We think the point is not sustained. So far as these Consular Courts exist at all, as such they are Courts of the United States, into which, by the general law, an alien friend may enter for redress against a citizen of the country of which the Court is an appendage. Mr. Cushing

places this subject in a very clear light.   He says : "The Chinese will go into the United States Consular Court as plaintiff, and that Court will take jurisdiction of the defendant as an American ; and where the demand is by an American against a Chinese, the former must, of necessity, be content with such judicial or executive action of the Chinese Government in the premises as appertains to their institutions, and as, by application, may be required on the part of the United States.

As to the other cases, that of controversies occurring in China, between citizens of the United States, and subjects of any other (christian) government, the treaty provides that the same 'shall be regulated by the treaties existing between the United States and such governments, respectively, without interference on the part of China.'   (Art. 25.)

Now, we have no special treaty with any of these governments on this point, nor is any needed, or necessarily required, or intended by stipulation under consideration.   With all we have treaties of amity, or of ordinary commercial and social intercourse, and that suffices to meet the exigency.

By the tenor of those treaties, as they are construed by the law and usage of nations, an Englishman has the right to sue a resident of America, or an American a resident Englishman, as alien friend, in all places wherever, respectively, the jurisdiction of the other country exists locally, and is complete as to subject matter, persons, and remedial forms.   (Fœlix, Dr. Intern, Prive. Tit. 11, Ch. 2.)

The jurisdiction of the United States is complete, as to their citizens in China, and the jurisdiction of Great Britain is complete as to her subjects in China.   That the jurisdiction in each case is exterritorial—that in China it is excepted from the local territoriality, and that it is outside of the territoriality of either Great Britain or the United States—is a fact wholly immaterial to the question.   It is a question free of all doubt on principles of international right, and subject only to the single inquiry whether the given country, each proceeding in established legal forms, by whatsoever authority such forms be established, has conferred on its Courts of justice in China jurisdiction *ad hoc,* or whether that remains to be done.

Here, again, the statute is explicit and ample.   It confers on

the Consular Courts jurisdiction of 'all civil cases arising under said treaty.' A demand of an Englishman against an American is a civil case arising under the treaty, as we see.

Therefore a suit may be brought by the Englishman against the American in the Consular Court of the United States, as, undoubtedly, in the Consular Court of Great Britain, it may, consistently with public law, be brought by an American against an Englishman.

If the Englishman were within the territorial jurisdiction of the United States, he might sue, but would also be subject to suit, in the local Courts, as the American might and would be in England. (Fœlix, Ubi Supra.) Nay, a suit would lie in the Courts of Great Britain or the United States, between residents, both being aliens in the country. (Fœlix, Ubi Supra.)"

The regulations adopted by the Consular Courts of the United States are made part of the case. The second rule provides that "when a citizen of the United States, who is a resident in China, or any subject of the Emperor of China, or the citizen or subject of any other State or nation, may have a right to bring suit against a citizen of the United States, in the United States Consular Court in China," etc. etc. If Huth & Co. being Englishmen by residence, wished to sue such of these assignees as were Englishmen, residing in China, in respect to this assignment, we presume there would be no doubt that the local jurisdiction of Great Britain in China, which seems to be similar to ours, would be competent to afford adequate relief.

Having reached the conclusion that the law governing this assignment, and determining its validity, is the common law, it remains to consider the objections urged against it in connection with that system. We understand by the "common law," as used in the Act of Congress, and applied to the arbitrament of controversies between citizens of the United States, that general body of law, which, as Judge Marshall expresses it, is constituted "by those general principles and those general usages which are to be found, not in the legislative Acts of any particular State, but that generally recognized and long established law which forms the substratum of the laws of every State," *i. e.* every State carved out of the British Colonies. We may look to American as well as English books, and to American as well

as English jurists, to ascertain what this law is, for neither the opinions nor precedents of judges can be said, with strict propriety, to be the law—they are only evidence of law. Mr. Cushing, in the same opinion from which we have quoted, (Vol. 7, 504, Opinions of Attorney-General,) says: "By 'common law,' (in the Act of 1848,) is intended that law which is to be found in the decisions of the Courts of Justice of the United States, both Federal and State, as distinguished from that law which is found in the statute law of the United States and of the States." And this language is incorporated in the Regulations by Commissioner McLane.

The Appellants claim that the assignment by this common law is void upon its face, for several causes which will be examined hereafter. But the Respondents say, by way of answer *in limine*, that this matter is foreclosed, because the Consular Courts at Canton passed upon this question in a controversy there pending, in which case the Consul, Mr. O. H. Perry, held that the assignment was valid. It is urged that the decision of this Court is as conclusive of the questions of local law decided as would be that of any other Court as to the law of its jurisdiction. There would be more force in this argument if the Consular Court were the highest judicial Court of the jurisdiction, but it seems that an appeal lies from the Consul to the United States Commissioner. And we are not aware that the rule which accords the force of definitive exposition of the local law to the decision and judgment of the Courts of the local jurisdiction has ever extended so far as to give that sanction to the judgment of a subordinate tribunal of the municipality or territory. The decision of the Consul is, doubtless, entitled to some weight, but we are not prepared to hold it as conclusive of the general question adjudicated by him. We proceed to consider the objections to this instrument:

1. That it is not the deed of Nye, or Nye Brothers & Co. but it is the paper of the Consul, Nye merely signing his name in attestation of the act of the Consul.

We think there is no weight in this objection. In order to make a trust it is enough that the trust be declared by the party to be charged and signed by him—this seems to have been done.

2. "That it is the act of G. Nye, Jr. alone." But it purports

to be the act of the firm, and is signed in the firm name. It is urged that there was no delivery shown. But this may be inferred from the acts done and the nature of the transaction, the claim made under the trust, the possession of the paper and of the property. This is not a deed; it is a mere parol assignment and trust. We are not aware of any rule requiring a delivery, as in formal deeds, as necessary in such cases. The making of the trust and its acceptance are sufficient, especially if accompanied or followed by the possession of the property. As no conditions are imposed on the creditors, an acceptance by them is presumed upon the general principle that a party is presumed to assent to acts done for his benefit. (*Nicholl* v. *Mumford*, 4 John. Ch. 522; Burr. on As. 308.)

3. It places the individual creditors of Nye on a par with the firm creditors in the distribution of the firm assets."

We do not so construe the paper. It is true the assignment is of the property of G. Nye, and of the firm, for the payment of his individual debts and the debts of the firm. But the assignment must be taken and the property administered in reference and according to the rules of law prevailing in the place of contract, and one of the rules of equity jurisprudence is, that the individual property must go to the individual creditors in priority to the firm creditors, and firm assets must go to the firm creditors in priority to the individual creditors of a partner; and there is nothing in the language of this deed which, when taken in connection with the principle, indicates or would give effect to a contrary construction. Nor do we concede that the misdirection of the property, which might be corrected in equity, would *ipso facto* vacate the deed, though it is not necessary, nor do we decide the point.

4. Nor is the trust void, as alleged, because it is not more fully or particularly declared. A trust of assets or property for creditors of itself suggests specific and well defined duties, and imposes specific and well defined obligations upon the Trustees. They are to hold and take care of, sell, and dispose of the property, so as to convert it, with convenient speed, into money, and distribute and pay the proceeds over to those entitled. This duty and this responsibility would not have been more plainly enjoined or created by express language, giving in detail, the

course of management and direction of the subject of the trust. What is vague in the contract is made certain by the law, and both are to be taken together.

5. We think the objection that the assignment was revocable is not well taken. After the assignees had taken possession of the property, the title and trust became fixed and executed, and it was not in the power of the assignors to defeat or affect it.

6. The objection to the style of designating the Trustees is not well founded. The Trustees must be designated, but whether by a firm name, or the individual name is not material, if the language used be such, as with certainty, to indicate the persons who are nominated as Trustees. It is not necessary that all the Trustees should assent to act as such. The presumption is of assent, and the assent of one is enough to give effect to the trust, though the rest expressly repudiate. (2 Kent's Com. 533, Notes and Cases there cited.)

7. The want of a schedule of the property is sometimes regarded as a circumstance of fraud, but the absence of a schedule has never, we believe, been held sufficient of itself to avoid a conveyance of this sort.

8. The next proposition is, that the deed is inoperative because one partner has no power to make an assignment of the firm property without the assent of the other partners.

It seems that G. Nye, Jr. was the only resident partner at Canton, and on the eve of some protested bills returning from London, made this assignment without consulting his associates. It is not easy to reconcile all the authorities upon this subject, and able jurists seem divided in opinion in regard to it. We think the weight of authority is in favor of the power. The case of *Harrison* v. *Sterry*, (5 Cranch,) expressly affirms it, and the facts of that case are very analogous to this. In *Anderson* v. *Tompkins*, (1 Brock. 458,) Ch. J. Marshall reaffirms the doctrine. *Deckard* v. *Case*, (5 Watts, 23,) is the same way. The reasoning of Mr. Justice Rogers states with great clearness the principle on which the doctrine rests. He says : " It is a general principle of the law of partnership that the partners are bound by what is done by each other in the course of the partnership business. They are considered as virtually present at and sanctioning the contracts they singly enter into in the course of trade,

and each is vested with the authority to act at the same time as principal and as the authorized agent of his copartner.

Among the powers most ordinarily exercised by partners is the *jus disponendi,* or the power which each partner has individually of disposing of the joint stock or merchandise. When the assignment is *bona fide,* I cannot doubt the power of one partner to transfer the whole as well as a part of the partnership effects." This doctrine was reaffirmed by the same Court in *Hennessy* v. *State Bank,* (6 Watts & Serg. 310.) The able and learned author on Contracts and on Mercantile Law and Partnership, after collecting all the American cases on this question, concludes: "If necessary for the protection of creditors, an assignment of all the personal property to a Trustee for their benefit by one partner, if his copartner is absent and cannot be consulted in season, and has, either expressly or by implication, left to him the sole management of the business, is valid." (Parson's on Mer. Law, 175, Note 1.)

It seems to us that the proof tends in this case to establish this precise state of things. Situated in a foreign country, at a great distance from the other partner residing there, we can scarcely conceive a condition in which the implication of the largest discretion ever confided to a partner would more properly result. The other partners do not seem to complain. Indeed, there is some evidence of their subsequent express assent, and the particular exigency existing appears to be sufficient to have authorized the action of the acting partner.

We have already extended this opinion to such length as forbids a detailed examination of other points. We have examined those not especially noticed, and must content ourselves with merely announcing the conclusions to which we have arrived, which are in accordance with those of the Judge below.

The last point to be noticed is, the charge of fraud *in fact.* The Judge has passed upon those matters of proof, and we see nothing to constrain us to reverse his judgment upon them.

The appointing of Nye, Jr. as Agent, with some compensation—the allotting of some furniture to the wife—the want of a schedule, and the control, such as it was, exercised over the joint affairs by Nye after the assignment, do not, in the absence of any proof of original fraudulent design, raise even a pre-

sumption of fraud, in fact, when all the circumstances are considered. Some of these suspicious circumstances are explained —the schedule was subsequently made; there would seem nothing very suspicious in getting a partner conducting a large firm, whose business was extensive and complicated, to assist assignees in bringing the assets to profitable account; to aid in collections and settlements and explaining the affairs; and the compensation was necessary, probably, to get the services of a bankrupt who seems to have surrendered all his property; the compensation seems not extravagant; the furniture was allowed the wife at the instance of many, perhaps the majority, of the creditors, and there is no proof that these subsequent acts, of benefit to Nye or his family, by the assignees were promised, or even contemplated, at the time of the assignment. We could not, upon such evidence, infer a fraud which is not presumed to exist by the law, much less do we feel disposed to overturn the decision of the Court below upon the facts on such proofs.

It is unnecessary to criticise the findings. Enough is found to which we see no good exception, to justify the conclusion, viz: the validity of the deed; the possession of the assignees; no fraud in fact; the levy and seizure by the defendant, and the value.

Judgment affirmed.